IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DUSTIN D. COFFMAN,

                    Plaintiff

          vs.                                        Case No. 17-4070-SAC

HUTCHINSON COMMUNITY
COLLEGE, et al.,

                    Defendants.


MEMORANDUM AND ORDER

          The plaintiff, Dustin D. Coffman, appears *pro se* bringing this

action alleging he was dismissed from the nursing program at Hutchinson

Community College ("HCC") in a manner that violated his federal and state

constitutional rights and that created actionable state common-law claims.

The case comes before the court on the defendants' second motion to

dismiss (ECF# 70) and on the plaintiff's motions for ruling (ECF# 106 and

107). Last year when it was the only defendant to have been properly

served, HCC filed a motion to dismiss. (ECF# 21). The court granted the

motion in part finding it was without jurisdiction to address the plaintiff's

state law tort claims. ECF# 28. The court, however, denied the balance of

HCC's motion, because it failed to address the allegations in the plaintiff's

supplement (ECF# 7) to his form complaint (ECF# 1). ECF# 28. All

defendants now move to dismiss for failure to state a claim for relief, and

the individual defendants also seek dismissal on qualified immunity grounds. ECF# 70.

The defendants filed a notice on January 10, 2018, certifying that they had served this motion, among other pleadings, by mail. ECF# 79. The *pro se* plaintiff, Dustin Coffman, thereafter submitted multiple filings, some or all of which are intended to be his response to the defendants' motion. ECF# 85, 91, 92, and 93. None of these submissions were filed within the 21-day deadline imposed by D. Kan. Rule 6.1(d)(2). Without objecting to the plaintiff's untimely responses, the defendants then timely filed their reply. ECF# 97. Thereafter, Mr. Coffman filed yet another document that also appears to address the merits of defendants' motion to dismiss. ECF# 100. The defendants object to this late filing and ask the court to strike it as either an untimely response or a sur-reply filed without leave of the court. ECF# 102. Mr. Coffman has been warned repeatedly on the importance of following the court's local rules and particularly "Rule 7.1 that governs the filing of motions and responses and replies thereto and Rule 7.6 that governs briefs and memoranda." ECF## 19 and 28, p. 4. The court sustains the defendants' objection and shall disregard the plaintiff's filing at ECF# 100.

**Rule 12(b)(6) Standards and Qualified Immunity**

The Tenth Circuit recently summarized the relevant standards governing a court's analysis of a Rule 12(b)(6) motion for failure to state a claim for relief:

> "A pleading is required to contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *SEC v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting Fed. R. Civ. P. 8(a)(2)). "We accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the" plaintiff. *Id.* (quoting *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013)). We then "determine whether the plaintiff has provided 'enough facts to state a claim to relief that is plausible on its face.'" *George* [*v. Urban Settlement Servs.*], 833 F.3d [1242] at 1247 [(10th Cir. 2016)] (quoting *Hogan v. Winder*, 762 F.3d 1096, 1104 (10th Cir. 2014)).
>
> "In determining the plausibility of a claim, we look to the elements of the particular cause of action, keeping in mind that the Rule 12(b)(6) standard [does not] require a plaintiff to 'set forth a prima facie case for each element.'" *Id.* (quoting *Khalik v. United Air Lines*, 671 F.3d 1188, 1192–93 (10th Cir. 2012)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). But "mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Id.* at 1214 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Thus, a "claim is facially plausible if the plaintiff has pled 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *George*, 833 F.3d at 1247 (quoting *Hogan*, 762 F.3d at 1104, which in turn quotes *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).
>
> However, "when legal conclusions are involved in the complaint[,] 'the tenet that'" we accept the allegations as true "is inapplicable to [those] conclusions." *Shields*, 744 F.3d at 640 (second alteration in original) (citation omitted).

*Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017).

The Tenth Circuit recently observed that *Twombly* requires sufficient factual allegations to show a violation of the plaintiff's constitutional rights and "requires enough specificity to give the defendant notice of the claim asserted." *Matthews v. Bergdorf*, 889 F.3d 1136, 1144 n. 2 (10th Cir. 2018). This bite taken by the *Twombly* standard may be "greater" when the affirmative defense of qualified immunity is being analyzed:

> Qualified immunity exists "to protect public officials from the 'broad-ranging discovery' that can be 'peculiarly disruptive of effective government.'" *Anderson v. Creighton*, 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Defendants are permitted to appeal from the denial of a motion to dismiss on qualified immunity grounds precisely to spare them the ordeal of discovery if the complaint fails to allege a constitutional violation or if the alleged violation was not clearly established. *Behrens v. Pelletier*, 516 U.S. 299, 306, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996). To "nudge their claims across the line from conceivable to plausible," *Twombly*, 127 S.Ct. at 1974, in this context, plaintiffs must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and that those rights were clearly established at the time. This requires enough allegations to give the defendants notice of the theory under which their claim is made.
>
> This does not mean that complaints in cases subject to qualified immunity defenses must include "all the factual allegations necessary to sustain a conclusion that defendant violated clearly established law." *Breidenbach v. Bolish*, 126 F.3d 1288, 1293 (10th Cir. 1997). In *Currier* we found this heightened pleading standard superceded by the Court's decision in *Crawford–El v. Britton*, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). *Currier v. Doran*, 242 F.3d 905, 916 (10th Cir.2001). *Twombly*, too, rejects a heightened pleading standard. 127 S.Ct. at 1973–74. However, the complaint must meet the minimal standard of notice pleading as articulated by the Court in *Twombly*. Although we apply "the same standard in evaluating dismissals in qualified immunity cases as to dismissals generally," *Shero v. City of Grove, Okl.*, 510 F.3d 1196, 1200 (10th Cir.2007), complaints in § 1983 cases against individual government actors pose

a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants. The *Twombly* standard may have greater bite in such contexts, appropriately reflecting the special interest in resolving the affirmative defense of qualified immunity "at the earliest possible stage of a litigation." *Anderson*, 483 U.S. at 646 n. 6, 107 S.Ct. 3034; Harlow, 457 U.S. at 818, 102 S.Ct. 2727. Without allegations sufficient to make clear the "grounds" on which the plaintiff is entitled to relief, Twombly, 127 S.Ct. at 1965 n. 3, it would be impossible for the court to perform its function of determining, at an early stage in the litigation, whether the asserted claim is clearly established.

*Robbins v. Oklahoma*, 519 F.3d 1242, 1248–49 (10th Cir. 2008) (footnote omitted).

**Plaintiff's Complaint ECF# 1 and 7.**

The court understands the defendants' struggle to understand what the plaintiff is asserting as his claims for relief. The plaintiff's filings are not "a short and plain statement" as contemplated by Rule 8(a). The plaintiff's allegations intermingle conclusory factual allegations of his own circumstances with excerpts of factual findings and legal conclusions taken from an order apparently issued by a federal district court from Michigan. This other court order involves a case that has no apparent legal or factual relationship to these Kansas proceedings. The plaintiff's filings confusingly blend his own factual allegations with excerpts from that court order. The potential for confusion is aggravated by the plaintiff's failure to use quotation marks or citations. In addition, the plaintiff's filings make it difficult to parse which factual allegations are deemed relevant for consideration under each of the respective claims for relief.

The plaintiff's complaint entitles one section, "Introduction," and sets out there a summary listing of his alleged claims against the defendants:

> 1) Violation of the plaintiff's First amendment (retaliation); 2) violation of the Fourteenth Amendment's due process clause; 3) Violation of the Fourteenth Amendment's equal protection clause; 4) Violation of the Kansas constitutional right to free speech; 5) Violation of Kansas' constitutional right to due process; 6) Violation of Kansas' constitutional right of equal protection under the law; 7) Breach of contract; 8) Defamation (as to defendants Jay Ballard and Kathy Sanchez); 9) Libel and slander as to defendants Jay Ballard and Kathy Sanchez; 10) Tortious interference with a contract as to defendants Debra Heckler, Cindy Hoss, Janet Hamilton, Kathy Sanchez and Jay Ballard; 11) Intentional infliction of emotional distress; 12) Violation of the Kansas Civil Rights Act; and 13) Violation of the Kansas victim protection act.

ECF# 7, p. 1. And, as taken from that section of the plaintiff's complaint entitled, "Statement of Facts," the court gleans the following as relevant allegations of fact.

In the fall of 2014, Dustin Coffman enrolled in HCC and was later accepted in the R.N. online bridge program in the Spring of 2015. The bridge program required Coffman to participate in a clinical rotation, and his participation was supervised in part by HCC's instructors, Jay Ballard and Kathy Sanchez, who are individually named as defendants.

Coffman alleges that during the Summer 2015 semester, his supervisors Ballard and Sanchez displayed a negative change of attitude toward him. Ballard criticized Coffman before other students and charge nurses for speaking Spanish to a patient and for eating chocolate given to

him by a charge nurse. Ballard also told Coffman that he could not go into the hospital chapel and pray during his break and that he could "not attempt to outsource a patient to a rehab facility of the Christian faith." ECF# 7, p. 2.

At the end of the plaintiff's clinical rotation on July 24, 2015, Ballard and Sanchez met with Coffman. They told him that, "he might have to sign a corrective action contract with the school for issues, that were discussed, by the Defendant Jay Ballard and for being sick and would be asked to do a virtual makeup of the rotation." *Id.* at pp. 2-3. "Nothing was mentioned about Unprofessional conduct by the Defendant in that meeting." *Id.* at p. 3.

The plaintiff alleges he had no problem with making up the clinical rotation day he missed because he had a contagious skin issue. When he got home with the material for the makeup assignment, Coffman realized the text book and the work book were different editions, and he could not complete the timed testing applications because the page references did not correspond. Because of this problem, Coffman alleges he "immediately" initiated a telephone conference with the defendant Sanchez. He asked two other persons to listen in as his witnesses. During the conference call, Sanchez said they "could just work something else out next semester" and also said, "do not worry about the corrective action contract as well." *Id.* at p. 3.

Two weeks before the start of the next school semester, which was Coffman's final semester of the registered nurse program, he learned that the corrective action contract was still an "issue." *Id*. As an exhibit to his memorandum opposing dismissal, the plaintiff attaches a copy of an email from Sanchez addressed to him and dated July 30, 2015, at 5:47 pm:

> Per our conversation on July 24, 2015, I am sending you the Corrective Action Contract for NR 216. Please read, review, download, add your student perception, sign and return by Aug 15, 2015. You may send your signed copy by mail or you may scan the signed copy and send by your Hutchinson Community College email or you may electronic sign and return through your Hutchinson Community College email.
> Kathryn Sanchez

ECF# 93, p. 51. The plaintiff also submits a copy of three emails which he sent to Sanchez in reply later that evening. The first of which reads, "Per our texts conversational said that I did not have too." *Id*. The plaintiff also attaches to his memorandum copies of emails he sent on August 3, 2015, to Ms. Sanchez. They state:

> This contract has several issues
> 1. This is my first corrective action and the wording says final corrective action.
> 2. The software should not allow scheduling of an OB day if it is not available.
> 3. We had visited in the break room post conference after my second day was at IV infusion about me going to the ER on my third clinical day.
> 4. The assignments are not correct via text messages about not doing unit six. Unit six is already filled in and the data disk information will not change so that could be considered cheating.
> 5. Time frame for completion of extra assignment is not clear.
> 6. It took until almost 1100 am to receive any texts on the issue of the wrong day due to tech issues.
> 7. I notified every Instructor about the issue.

8

8. I was also told by the director that there would be no problems on a scheduling issues.

9. The assignments has the wrong editions of text book and work book.

10. 1st corrective contract not final wording needs changed.

11. Text correspondence and verbal communication between you and I stated no need for this contract.

12. Extension was granted via communication between us due to the text book work book not being the same is not in the contract.

13. Why do you need a contract? Unless its for some other motives?

14. Did the other student who had to do make up work over break have a contract? Please show evidence of for review.

Second email:

I also have all the text data from all instructors plus I record my clinical day on my dictation recorder. This is to ensure the facts are not a matter of hearsay for any possible state board administration need. Been down that road and not getting involved with a hearsay case again.

ECF# 93, p. 50. In his complaint, the plaintiff alleges that upon receiving the corrective action contract and noticing its use of "unprofessional conduct" he "felt harassed and attacked by the allegations made by defendants, Jay Ballard and Kathy Sanchez." *Id.* at p. 4.

He alleges the corrective action contract quotes text messages taken out-of-context to accuse him of unprofessional conduct. He alleges that on July 18, 2015, there was a communication error in clinical scheduling, and that upon learning of this error he left the hospital where this clinical training was to occur. He also alleges the quoted text messages from June 16, 2015, erroneously make it appear as if he had been late for class when, in fact, he was in class and seated before the instructor began class. The plaintiff denies the allegation in the contract that he applied for a

job with the Hutchinson Regional Medical Center while on clinical time. The

plaintiff alleges that this job application process occurred over his lunch

break after he was recruited by Center staff. He also alleges that other

nursing students in the program are recruited by the Hospital and are not

singled out for engaging in unprofessional conduct. Finally, the plaintiff also

submits as an exhibit to his memorandum a copy of Ms. Sanchez's email to

him dated August 21, 2015, at 3:27 pm:

> On July 30, 2015, you received the following email.
> Per our conversation on July 24, 2015, I am sending you the
> Corrective Action Contract for NR 216. Please read, review, download,
> add your student perception, sign and return by Aug 15, 2015. You
> may send your signed copy by mail or you may scan the signed copy
> and send by your Hutchinson Community College email or you may
> electronic sign and return through your Hutchinson Community College
> email.
> Kathryn Sanchez
> . . . .
> As of Friday August 21, 2015 at 1200 I have not received the
> assignment or signed contract. It is the decision of the Online Bridge
> Program team to have you removed from your fall courses until issue
> can be resolved. Please schedule a meeting through Nita Gradestaff to
> meet with Online Bridge Program team, to discuss any issues or
> concern you may have.
> Kathryn Sanchez

ECF# 93, p. 32. To his other legal memorandum, the plaintiff attaches his

multiple email replies sent to Ms. Sanchez on August 21st. ECF# 92, pp. 20-

24.

*Corrective Action Contract*

Because the plaintiff makes this contract and its contents a

central part of his complaint, the defendants have submitted a copy of the

contract as an exhibit to their motion to dismiss. The court does not understand the plaintiff to make any substantive challenge to the accuracy of that copy and its contents summarized below. The corrective action contract is a four-page document entitled, "Learning Contract for Corrective Action in Theory/Clinical." ECF# 71-1, p. 2. It opens with a "Description of Concern," that being Dustin Coffman's "Non-Professional Behavior." *Id*. It frames the issues as those having been discussed by Kathryn Sanchez and Jay Ballard with Coffman on July 24, 2015. *Id.*

The first issue is entitled, "Completion of clinical for NR 216," and describes Coffman as having self-scheduled for clinical day at Hutchinson Regional Medical Center on July 18, 2015, when no clinical was available and then as having "proceeded to complete clinical experience in the ER without an instructor present." *Id.* The contract sets out certain text messages exchanged between Coffman and Sanchez on the morning of July 18, 2015, and concludes that Coffman "did not complete the required clinical experience for OB rotation." *Id*. The contract sets out as the corrective action that Dustin receive additional instruction on the scheduling program, that he be allowed to complete his missed clinical requirement for NR 216, that his contact with clinical instructors would be through defined methods, and that his clinical opportunities for the next semester were discussed.

The second issue is entitled, "Appropriate Communication for clinical setting," and states the expectation that students will "use

appropriate professional communication in the student clinical role." ECF#
71-1, p. 3. The contract states, "On July 16 and 17, 2015, Dustin discussed
personal illness (Norwegian scabies), political and religious information that
is not needed in the professional role as a student in the clinical setting." *Id.*
The stated corrective action included discussing appropriate communication
for student clinic setting, taking direction without unnecessary reply, being
"courteous and respectful with patients, resource persons and clinical
instructors and faculty." *Id.*

The third issue is entitled, "Appropriate Communication for
clinical concerns," and states the expectation that students are "to be
prepared and on time for every clinical experience and use appropriate
communication with faculty and clinical instructors." *Id.* at p. 4. The contract
recounts text messages exchanged on four different days in June and July of
2015. The corrective action repeats additional instruction on scheduling
program, prompt communication of attendance issues, and only emergency
communications to instructor's personal cell phone.

The fourth issue is entitled, "Appropriate use of clinical
experience," and states that, "Dustin self-reported seeking employment and
references for employment at Hutchinson Regional Medical Center during
clinical time. Seeking employment and getting references does not meet the
objectives of the clinical experience and is not professional conduct of a

student." *Id.* at p. 4. The corrective action bars Dustin from "seeking employment and references for employment during clinical time." *Id.*

Immediately above the instructor Sanchez's signature, the contract states that, "In order for Dustin Coffman to continue the program, he must complete the corrective actions listed above and follow throughout the remainder of the NR 220 and NR221 courses." The contract is dated July 30, 2015. The contract provides a section for the student to record his "perception." *Id.* at p. 5. Above the student's signature line, the following affirmation appears, "I desire to continue the program. I understand that in order to continue I must complete the corrective actions listed above." *Id.* After the student's signature, there is this warning sentence, "Failure to sign will result in dismissal from the program." *Id.*

The plaintiff alleges he believed that signing the contract would have constituted admitting to unprofessional conduct that would jeopardize his L.P.N. license. So, he refused to sign the contract and had his attorney communicate his concerns with the contract. These concerns included using the description of "unprofessional conduct," taking his text messages out of context, and misstating the facts. The plaintiff also filed a grievance with the Veterans Affairs representative at HCC that alleged abusive conduct by the instructors Sanchez and Ballard.

*Administrative Proceedings*

The plaintiff alleges that the defendant Debra Hackler, chairman of the Nursing Department, contacted him in late July to schedule a faculty meeting over his concerns with the contract. When Mr. Coffman requested that his attorney be conferenced into the meeting and that his father be allowed to attend, Ms. Hackler indicated these additional parties would not be allowed in the meeting. The plaintiff alleges the defendant Hackler became "agitated and told the Plaintiff that he was officially kicked out of the R.N. program for academic reasons and was no longer allowed to attend" HCC. ECF# 7, p. 8. The plaintiff asserts based on the student handbook that he should not have been terminated from the course until the investigation of his grievance had been completed.

The plaintiff next pursued an academic appeal before the defendant Cindy Hoss, Vice President of Academic Affairs at HCC. ECF# 7, p. 10. This hearing was recorded, and the plaintiff's father was present, as was "Safety Department Chair Bobby White." *Id.* The audio recording of this hearing is referenced in the complaint and has been submitted as an exhibit to these motion proceedings. The court has listened to this recording. The plaintiff alleges that the hearing should have considered only his academic status, but that instead it was focused on the corrective action contract which he asserts was "proven to be false in its allegations, on every point, other than getting a job offer and told to get an application by the

Hutchinson Regional, Hospital Hospitalist." *Id.* The plaintiff alleges Ms. Hoss commented that the plaintiff cannot go to school at HCC because two instructors did not like him. The plaintiff submits as an exhibit to his response a letter from Ms. Hoss dated September 18, 2015, which states, "Upon review of your documentation and comments you shared during the Academic Appeal hearing meeting on Monday, September 14, 2015, and upon review of the Hutchinson Community College Nursing Department documentation and Academic Appeal hearing meeting, I am upholding your dismissal from the HCC Nursing Program." ECF# 92, p. 7.

The plaintiff then appealed to the Academic Appeal Committee which heard his appeal on September 29, 2015, and upheld his academic dismissal. He then requested HCC's President Carter File to review the findings. The plaintiff alleges he was informed by the appeals committee that the recordings from the prior hearings were lost and that the same would not be available to Dr. File for his review. The plaintiff asserts the defendants employed the wrong procedures and rules in dismissing him for academic grounds and in affirming his dismissal.

The plaintiff alleges he is a veteran and is being treated for A.D.H.D. diagnosis following his deployment. The plaintiff, however, notes he did not request accommodation and did not seek different treatment from HCC for his condition. The plaintiff instead notes his academic performance was equal to or better than other students in the nursing program. He

asserts discrimination because he was subjected to different protocols for his dismissal. He does not allege his different treatment was because of his asserted disability.

The plaintiff's complaint bears all the markings of a Rule 56 pleading too. Presumably, this is because he borrows liberally from the Michigan federal district court's summary judgment opinion. The complaint, therefore, includes under the general title of "Analysis" specific allegations and arguments with respect to the following claim headings.

*Due Process*

The plaintiff here generally claims both a property interest in continued enrollment at HCC and a contractual interest from the student handbook. He maintains that both entitle him to procedural due process protection from arbitrary dismissal. While he admits that the corrective action contract informed him of the instructors' dissatisfaction with him, he denies the truthfulness of these stated reasons as well as their justification for his dismissal. He takes the position that his academic grades were sufficient, his coursework was passing, and he was receiving job offers. He asserts his dismissal could not have been for academic reasons and that his clinical instructors' dislike of him is insufficient grounds for dismissal. He further alleges that the corrective action contract wrongly accuses him of unprofessional conduct as a student and that he could not sign it as this would constitute giving false information to the state board of nursing should

there have been an inquiry. The defendants refused to change the contract when he disputed these matters. The plaintiff concedes he was warned of the consequences for not signing the contract. ECF# 7, p. 25.

### First Amendment—Retaliation

Under the heading of "protected speech," the plaintiff asserts he has alleged facts showing bias by the defendants Sanchez, Ballard, and Hoss, in proposing the corrective action contract replete with false and misleading information. ECF# 7, p. 26. Later in the complaint, the plaintiff alleges his protected speech was his grievance sent to the Veteran Affairs office and made against his instructor who had reprimanded him for eating a chocolate, had not allowed him to pray in the hospital chapel, and had not allowed him to recommend a "Christian rehab facility." ECF# 7, p. 34. The plaintiff asserts his grievance was protected speech as a student and his dismissal from school certainly had a chilling effect upon speech. The plaintiff's allegations of a causal connection between the grievance and his dismissal are confusing. He points to the timing between his grievance and his dismissal by Ms. Hacklar but admits it is "difficult to tie the dismissal directly protected to the speech based on . . . circumstantial evidence." *Id.* at p. 37. He further admits "there is no evidence that . . . [his] protected speech . . . served as a motivation in anyone's decision to dismiss." *Id.* at pp. 37-38. Nonetheless, he alleges it's enough that his protected speech caused the corrective action contract and the erroneous allegations in it. The

court does not understand this argument, because Coffman submitted his

grievance in response to the corrective action contract.

### Breach of Contract

The plaintiff asserts his student relationship to HCC "is explicitly

contractual in nature" with "the Student Handbook being the contract for the

college and student." ECF# 7, p. 29. He alleges HCC breached this contract

in not following the disciplinary policies and procedures.

### Equal Protection

He claims he "was intentionally treated differently, from other

similarly situation without a rational basis—a 'class of one' equal protection

violation." ECF# 7, p. 31. The plaintiff alleges students with similar academic

records were not subjected to "the same concerns from faculty members" or

did not have their clinical work judged deficient in the same way. He claims

his treatment lacked a rational basis based on the demonstrated animus of

Sanchez, Ballard and Heckler. He asserts the animus is demonstrated from

Ballard's treatment of him in clinic, the false and misleading information in

the corrective action contract, and the recorded comment of Ms. Hoss at the

recorded academic appeal hearing that his clinical instructors did not like

him.

### Discrimination

Throughout the complaint, the plaintiff makes references to

"discrimination." But at page 38, he includes the following as reasons for

18

discrimination, "mental health diagnosis of A.d.h.d., racial bias as my mother is 1/4 cherokee indian." ECF# 7, p. 38. He alleges both were disclosed on his "enrollment paper work." *Id.* at 40. He also mentions that "a con artist's photo on the world wide web that makes me out to be a child stealing pedophile." *Id.* at 38. He alleges discrimination in that he was dismissed for academic reasons even though he was passing all sections and that other students with lower grades did enroll and complete the program. *Id.* at 39. The plaintiff's complaint does not delineate a separate claim for discrimination under any state or federal statutory scheme. More importantly, the plaintiff's cursory, vague and repeated references to discrimination are no more than labels and conclusions devoid of any specific factual allegations. The court does not understand the plaintiff as intending to bring an actionable claim of statutory discrimination. If he purporting to do so on the facts as alleged in his complaint, the court would have to conclude that they are utterly lacking in facial plausibility.

*State Law Claims—Tortious Interference with Contract, Defamation, and Intentional Infliction of Emotional Distress*

For tortious interference with contract, the plaintiff alleges Ballard and Sanchez acted as agents who individually benefitted from his dismissal because that is what they wanted. *Id.* at 41. For defamation, the plaintiff alleges he was "not guilty of unprofessional conduct" outlined in the corrective action contract, and the defendants refused to make the corrections suggested by his counsel. *Id.* at 42-44. For intentional infliction

of emotional distress, the plaintiff simply alleges he has treatment notes to confirm this injury.

**ANALYSIS AND RULING**

The defendants first challenge that the plaintiff's complaint fails to allege sufficient facts to state a claim for relief. As the above summary of allegations shows, the court is particularly mindful of the following Rule 12(b)(6) tenets. "Thus, in ruling on a motion to dismiss, a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The Tenth Circuit regards the *Twombly–Iqbal* decisions as crafting a new "refined standard" where "plausibility refers to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (internal quotation marks and citations omitted). "[T]he degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context . . . ." *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) (citation omitted).

A complaint that is filed pro se must be liberally construed and the court must apply "less stringent standards than formal pleadings drafted

by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir.2007) (citations omitted). In other words, "if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction or his unfamiliarity with pleading requirements." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Nevertheless, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," dismissal is appropriate. *Twombly*, 550 U.S. at 558. A pro se litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." *Hall v. Bellmon*, 935 F.2d at 1110. The court "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir.1997); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir.1991). A court may not assume that a plaintiff can prove facts that have not been alleged, or that a defendant has violated laws in ways that a plaintiff has not alleged. *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); see also *Whitney*, 113 F.3d at 1173–74. For that matter, "the court

need accept as true only the plaintiff's well-pleaded factual contentions, not his conclusory allegations." *Hall*, 935 F.2d at 1110.

In the same vein, the Tenth Circuit's rule is that "dismissal of a pro se complaint for failure to state a claim is proper only where it is obvious that the plaintiff cannot prevail on the facts he has alleged and it would be futile to give him an opportunity to amend." *Gee v. Pacheco*, 627 F.3d 1178, 1188 (10th Cir.2010) (internal quotation marks and citation omitted). "[T]he district court should allow a plaintiff an opportunity to cure technical errors or otherwise amend the complaint when doing so would yield a meritorious claim." *Curley v. Perry*, 246 F.3d 1278, 1284 (10th Cir.), *cert. denied*, 534 U.S. 922 (2001); *Hall*, 935 F.2d at 1110 ("[T]he plaintiff whose factual allegations are close to stating a claim but are missing some important element that may not have occurred to him, should be allowed to amend his complaint." (citation omitted)). While Fed.R.Civ.P. 15(a)(2) instructs that leave should be given "freely … when justice so requires," a court may refuse leave "if the amendment would be futile." *U.S. ex. rel. Ritchie v. Lockheed Martin Corp.*, 558 F.3d 1161, 166 (10th Cir.2009) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)). "A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir.2006).

*First Amendment—Retaliation*

As set out above, the plaintiff here claims he engaged in protected speech to the Veteran Affairs office in the form of a grievance against his clinical instructors for reprimanding him for eating a chocolate, for not allowing him to pray in the hospital chapel, and for not allowing him to recommend a "Christian rehab facility." ECF# 7, p. 34. The plaintiff asserts that his grievance is protected speech as a student and that his dismissal from school had a chilling effect upon his speech. To state a first amendment retaliation claim outside of an employment context or contractual relationship, a plaintiff must allege as provable:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected activity."

*Leverington v. City of Colorado Springs*, 643 F.3d 719, 729 (10th Cir. 2011) (internal quotation marks and citation omitted).

The defendants correctly argue that the plaintiff's complaint concedes he is unable to allege any link or connection between those deciding to dismiss him and his grievance. He openly admits "there is no evidence that . . . [his] protected speech . . . served as a motivation in anyone's decision to dismiss." ECF# 7 at pp. 37-38. For that matter, the complaint fails to allege any causal connection between his grievance and the prior corrective action contract. For that matter, the plaintiff's complaint fails to allege how the proposed corrective action contract even caused him

23

an injury that would chill his protected speech. The proposed contract does not require the plaintiff to admit any alleged conduct and, instead, provides him space for setting out his own "perception." ECF# 71-1, p. 5. The email of Ms. Sanchez expressly referred to his opportunity to fill out his perception and sign the corrective action contract. There are no allegations that the plaintiff tried and was denied any opportunity to set out his perceptions in the corrective action contract. While the contract was primarily directed at improving his performance and conduct in future clinical courses, the plaintiff does not allege that any harm or injury would have resulted from those corrective actions. Instead, it is difficult to see how these proposed corrective actions required anything more than what was already expected of Mr. Coffman as a nursing student in the clinical program. In sum, the plaintiff has not alleged a First Amendment retaliation claim, and the facts as alleged do not indicate that he would be able to allege a claim if given an opportunity to amend his complaint.

*Denial of Due Process (Federal and State)*

"Sections 1 and 2 of the Kansas Constitution Bill of Rights 'are given much the same effect as the clauses of the Fourteenth Amendment relating to due process and equal protection of the law." *State v. Limon*, 280 Kan. 275, 283, 122 P.3d 22 (2005)(quoting *Farley v. Engelken*, 241 Kan. 663, 667, 740 P.2d 1058 (1987)); *see Coburn By and Through Coburn v. Agustin*, 627 F.Supp. 983, 986 (D. Kan. 1985)("Kansas cases appear to

24

construe Kansas constitutional provisions as being substantially the equivalent of the parallel provision in the United States Constitution."). The two elements to a claim alleging denial of procedural due process are, "(1) a constitutionally protected liberty or property interest, and (2) a governmental failure to provide an appropriate level of process." *Citizen Center v. Gessler*, 770 F.3d 900, 916 (10th Cir. 2014) (citations omitted), *cert. denied*, 135 S.Ct. 1896 (2015). The defendants concede the plaintiff has alleged his continued enrollment in the HCC's nursing school is a protected property interest. Because discovery would be needed on the factors relevant to this determination, the defendants will assume a property interest for purposes of this motion. The defendants, however, contend the plaintiff has failed to allege how HCC has provided insufficient process to protect any claimed property interest in continued enrollment.

The defendants contend the corrective action contract addressed deficiencies in Coffman's academic performance which means that his dismissal for not signing the corrective action contract also involves a judgment academic in nature. Thus, the defendants argue for applying the less rigorous due process requirements used when academic judgment is involved:

> With regard to school decisions, different standards are used depending on whether the school makes an academic judgment or a disciplinary determination. There are less stringent procedural requirements in the case of academic dismissals.  To satisfy Due Process prior to termination or suspension of a student for deficiencies in meeting minimum academic performance, [school authorities] need

only advise that student with respect to such deficiencies in any form. Disciplinary actions require that the student be given oral or written notice of the charges against him, and if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.  The hearing before the school need not be formal, but may be an informal give-and-take and there need be no delay between the time notice is given and the time of the hearing.

*Brown v. University of Kansas*, 16 F. Supp. 3d 1275, 1289 (D. Kan. 2014) (internal quotation marks and citations omitted), *aff'd*, 599 Fed. Appx. 833 (10th Cir. Jan. 13, 2015) .

In alleging this claim, the plaintiff admits his dismissal was an academic judgment based on his refusal to sign the proposed corrective contract which addressed his academic performance deficiencies in the clinic program. As set out above, the contract discussed Coffman's deficiencies in completing the requirements of a clinic class, in using appropriate communications in a clinical setting, in scheduling and attending clinic sessions, in engaging in appropriate use of clinical time, and in communicating with the instructors. The nature of these deficiencies is principally academic in character as all relate to Coffman's performance in the clinical program. *See Roach v. University of Utah*, 968 F.Supp. 1446, 1453 (D. Utah 1997). Academic dismissal may include grounds such as appearance, maturity of behavior, and timeliness, because these can be significant factors in determining whether a student will be a good nurse or doctor. *See, e.g.*, *Board of Curators of University of Missouri v. Horowitz*,

435 U.S. 78, 91 n.6 (1978); *Hennessy v. City of Melrose*, 194 F.3d 237, 242-43, 251 (1st Cir. 1999).

In justifying the less rigorous due process protection for academic dismissal, the Supreme Court distinguished disciplinary dismissal from academic dismissal noting that the former carried the possibility of error and justified a student's need to present his side while the former involved, "the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Horowitz*, 435 U.S. at 90. For an academically dismissed student, due process is sufficient if there is prior notice of faculty dissatisfaction with performance and of the possibility of dismissal, and the decision to dismiss must be careful and deliberate. *Trotter v. Regents of University of New Mexico*, 219 F.3d 1179, 1185 (10th Cir. 2000) (citing *Schuler v. University of Minn.*, 788 F.2d 510, 514 (8th Cir. 1986), *cert. denied*, 479 U.S. 1056 (1987)). "[T]he Supreme Court [has] held that the due process clause does not require that a student dismissed from a state medical school for academic reasons be given a hearing." *Trotter*, 219 F.3d at 1185 (citing *Horowitz*, 435 U.S. at 86-90). A school's failure "to follow its own regulations," "its own academic rules," or "its own grievance appeal procedures" does not give rise to a procedural due process claim. *Trotter*,

27

219 F.3d at 1185 (citing *Horowitz*, 435 U.S. at 92; *Schuler*, 788 F.2d at 515).

For a substantive due process claim against an academic decision, the plaintiff must assert "the decision was the product of arbitrary state action rather than a conscientious, careful and deliberate exercise of professional judgment." *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston University*, 245 F.3d 1172, 1182 (10th Cir. 2001) (citing *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 224-25 (1985)). "A plaintiff may make such a showing by evidence that the challenged decision was based on 'nonacademic or constitutionally impermissible reasons,' rather than the product of conscientious and careful deliberation." *Id.*

The plaintiff openly alleges that in his earlier meeting with Ballard and Sanchez and in the later corrective action contract sent to him he received prior notice of faculty's dissatisfaction with his performance. There is no dispute that the contract contained the following warning just below his signature line, "Failure to sign will result in dismissal from the program." On the face of his allegations, the plaintiff cannot bring a claim for having been denied constitutionally sufficient notice.

The plaintiff goes on to allege that when he took issue with the contract, the nursing department chairperson, Ms. Hackler, asked him to attend a faculty facts and findings meeting. Coffman said he would attend but that he would have his legal counsel appearing also by conference call

28

and that his father would also be present. Ms. Hackler told the plaintiff that he could not have these persons present at this meeting. When the plaintiff insisted otherwise, Ms. Hackler informed the plaintiff that his summer semester grades would not be changed. And when the plaintiff continued to argue with Ms. Hackler, "she became even more agitated and told the Plaintiff that he was officially kicked out of the R.N. program for academic reasons and was no longer allowed to attend" HCC. ECF# 7, p. 8. The plaintiff alleges a denial of due process from being denied legal representation at a hearing before dismissal and from then being academically dismissed when he had passing grades. Neither circumstance constitutes a valid due process claim. Due process does not require a prior hearing before an academic dismissal which dooms any claim based on legal representation at one. The plaintiff's circumstances here would not make out a constitutional claim to be represented by retained counsel. *See Rustad v. U.S. Air Force*, 718 F.2d 348, 350 (10th Cir. 1983) (no constitutional right to counsel before disenrollment from academy for disciplinary infractions). His passing grades do not otherwise prevent an academic dismissal on other grounds such as those outlined in the corrective action contract which he refused to sign and to complete with his own perception of the events. *See Yaldo v. Wayne State University*, 266 F.Supp.3d 988, 1005 (E.D. Mich. 2017) ("[D]ismissing a medical student for lack of professionalism is academic evaluation. *Al-Dabagh v. Case W. Reserve Univ.*, 777 F.3d 355,

360 (6th Cir.), *cert. denied*, ---U.S.---, 135 S.Ct. 2817 (2015) (emphasizing that 'academic evaluations' may permissibly extend beyond raw grades and other objective criteria)." Nor does Coffman's filing of a student grievance and the triggering of student handbook procedures tie the hands of school staff in determining an academic dismissal. Simply put, a due process claim is not stated merely from staff's failure to follow the school's own grievance rules and procedures.

The plaintiff has not alleged facts showing that his academic dismissal was not a conscientious, careful and deliberate exercise of professional judgment. The learning contract for corrective action identified the student academic behavior in question and discussed the fair expectations imposed on student behavior. The plaintiff does not allege how any of the imposed corrective actions would be unreasonable, unfair, or discriminatory. The plaintiff's dispute principally lies with whether his academic behavior should have ever been questioned and made the subject of a corrective action contract. Such matters clearly fall within the realm of academic discretion concerning appropriate clinic student behavior in the nursing program that is entitled to deference. *See Al-Dabagh*, 777 F.3d at 359 (Overturning the decision to dismiss a student based on multiple allegations of unprofessional conduct would put the court in the position of "decid[ing]for ourselves whether he behaved in a sufficiently professional way to merit a degree," which "goes beyond our job description."). The

plaintiff's conclusory allegations of ill will by his instructors fail to state a due process claim, procedural or substantive. They rest on no more than his disagreement with the instructors' exercise of their academic discretion and judgment upon his performance as a clinical nursing student. His allegations do not evidence how this discretion and judgment by its nature or by the manner it was used would sustain a reasonable inference of arbitrariness, ill will, or discrimination. The plaintiff makes some random and conclusory allegations of possible discriminatory motives without any supporting substantive allegations tending to show knowledge or other circumstances indicative of a discriminatory motive.

Finally, the plaintiff exhausted the student grievance appeal process at three different levels, all of which affirmed his academic dismissal after receiving and reviewing his presentation. *See Trotter*, 219 F.3d at 1185 ("The number of appeals and review hearings afforded Trotter convince us that the Medical School's decision was careful and deliberate.") The plaintiff has not alleged any constitutional deficiencies with this appeal process. The court agrees with the defendants that the plaintiff has failed to plead a due process claim and that the facts as known and alleged would not support a claim for relief.

*Equal Protection*

As outlined above, the plaintiff here claims he is a class of one who was intentionally treated differently from others similarly situated

without a rational basis for doing so. The Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), recognized the existence of an equal protection claim in a zoning dispute, "where the [single] plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* "'The paradigmatic "class of one" case, sensibly conceived, is one in which a public official, with no conceivable basis for his action other than spite or some other improper motive (improper because unrelated to his public duties), comes down hard on a hapless private citizen.'" *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011) (quoting *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005)). The plaintiff's burden in bringing such a claim and the judicial concerns raised by such a claim have been discussed by the Tenth Circuit:

> To prevail on this theory, a plaintiff must first establish that others, "similarly situated in every material respect" were treated differently. *Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1210 (10th Cir.2006). A plaintiff must then show this difference in treatment was without rational basis, that is, the government action was "irrational and abusive," *id.* at 1211, and "wholly unrelated to any legitimate state activity," *Mimics, Inc.* [*v. Vill. of Angel Fire*], 394 F.3d [836] at 849 [(10th Cir. 2005)] (quotation omitted). This standard is objective—if there is a reasonable justification for the challenged action, we do not inquire into the government actor's actual motivations. *Jicarilla Apache Nation*, 440 F.3d at 1211.
>
> We have approached class-of-one claims with caution, wary of "turning even quotidian exercises of government discretion into constitutional causes." *Id.* at 1209. In *Jennings v. City of Stillwater*, 383 F.3d 1199, 1210–11 (10th Cir. 2004), for example, we discussed the risks such a claim could pose to ordinary government decision-making:

> [T]he concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors. It is always possible for persons aggrieved by government action to allege, and almost always possible to produce evidence, that they were treated differently from others, with regard to everything from zoning to licensing to speeding to tax evaluation. It would become the task of federal courts and juries, then, to inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection review. This would constitute the federal courts as general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system.
> These concerns are magnified with challenges to low-level government decision-making, which often involves a great deal of discretion. The latitude afforded police officers, IRS agents, university administrators, zoning officials, and other, similar government actors necessarily results in a sizeable amount of random variation in outcome. If even innocuous inconsistencies gave rise to equal protection litigation, government action would be paralyzed.

*Kansas Penn Gaming, LLC v. Collins*, 656 F.3d at 1216–17. In furtherance of these concerns, the Tenth Circuit has "recognized a 'substantial burden' that plaintiffs demonstrate others 'similarly situated in all material respects' were treated differently and that there is no objectively reasonable basis for the defendant's action." *Id.* at 1217 (quoting *Jicarilla Apache Nation*, 440 F.3d at 1212. Applying this "refined framework" within the plausibility standard governing a motion to dismiss, the Tenth Circuit has concluded that a plaintiff "must offer enough specific factual allegations to 'nudge[] their claims across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

In recognizing this "class-of-one theory of equal protection," the Supreme Court has used it in situations of arbitrary government classifications that involved the application of clear standards and resulted in departures readily assessed. *Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591, 602 (2008); *see Planned Parenthood Association of Utah v. Herbert*, 828 F.3d 1245, 1254 (10th Cir. 2016). The Court in *Engquist* distinguished those situations where the government body or officials are exercising discretionary authority to make subjective and individualized determinations. *Id*. The Tenth Circuit in *Herbert* quoted from *Engquist*:

> The Court then concluded that "[t]here are some forms of state action … which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." *Id*. at 603, 128 S.Ct. 2146. "In such cases," the Court held, "the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted." *Id*. "In such situations," the Court explained, "allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." *Id*.
> Ultimately, the Court concluded that "[t]his principle applies most clearly in the employment context, for employment decisions are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify." *Id*. at 604, 128 S.Ct. 2146. The Court stated that, "[u]nlike the context of arm's-length regulation, such as in *Olech*, treating similarly situated individuals differently in the employment context is par for the course." *Id*. "Thus," the Court held, "the class-of-one theory of equal protection—which presupposes that like individuals should be treated alike, and to treat them differently is to classify them in a way that must survive at least rationality review—is simply a poor fit in the public employment context." *Id*. at 605, 128 S.Ct. 2146. "To treat employees differently," the Court stated, "is not to classify them in a way that raises equal protection concerns." *Id*. "Rather," the Court stated, "it is simply to exercise the broad discretion that typically

characterizes the employer-employee relationship." *Id.* And, the Court stated, "[a] challenge that one has been treated individually in this context, instead of like everyone else, is a challenge to the underlying nature of the government action." *Id.*

*Herbert*, 828 F.3d at 1254-55. Other courts have extended the analytical

structure offered in *Engquist* for the public employment setting to the

context of a student bringing a class-of-one equal protection claim against

an instructor or educational institution:

> These courts have "found the public education context an equally poor fit for class-of-one equal protection claims due to the inherently discretionary decisionmaking that occurs there." *Nofsinger v. Virginia Commonwealth Univ.*, 12–236, 2012 WL 2878608, at *11 (E.D.Va. July 13, 2012) (and also noting the "deleterious effects that would befall our public institutions of higher education if constitutional questions constantly arose out of grades and evaluations."). *See also Yan v. Penn State Univ.*, 10–00212, 2010 WL 3221828, at *5–6 (M.D.Pa. Aug.13, 2010) (holding that <u>*Engquist*</u> precluded the plaintiff from bringing a class of one theory of Equal Protection against the university for her expulsion from a Ph.D. program.).
>
> The Court agrees with the cited cases and finds that the class of one Equal Protection claim is a poor fit for the facts. Here, there is no clear standard by which Dr. Bauer evaluated students retaking parts of her class, for she testified that she had the discretion to allow certain students who failed portions of her class to redo those specific portions. Given no clear standard and Dr. Bauer's discretion to fashion how she conducts her class and allows students to retake portions of her class, the case falls outside of *Olech*, and within *Engquist*'s class of one theory of Equal Protection bar.

*Reyes v. Bauer*, 2013 WL 3778938, at *9-*10 (E.D. Mich. Jul. 18, 2013);

*see also, Salau v. Denton*, 139 F.Supp.3d 989, 1007 (W.D. Mo. 2015)

("Because of the discretionary nature of the student disciplinary

proceedings, this action is not suited for a 'class of one' theory."); *Zimmeck*

*v. Marshall University Bd. of Governors*, 2014 WL 108668, at *5 (S.D.W.Va.

2014) (class-of-one theory does not apply in public education settings). The general inapplicability of *Engquist*'s analysis to the public education setting is plain and persuasive. The court finds that the plaintiff's class-of-one equal protection claim is unavailable here.

Even presuming the plaintiff could bring equal protection claims on a class-of-one theory in this academic setting, he is unable to allege the facts needed to satisfy the exacting standards required for such a claim. Nothing he has submitted shows he can adequately allege that he was similarly-situated to another student in all material respects based on behavior, attitude, experience, and performance in the clinical setting. As the learning contract demonstrates, there are multiple and subjective variables material to the academic decision concerning the need and terms of a corrective action learning contract. It is insufficient to allege only generally that others are comparable and similar because they are clinical students who may have missed a class and did not receive a corrective action contract. This does not amount to specific factual allegations plausibly showing how another student is similarly situated in every material respect. For that matter, the plaintiff's complaint is insufficient in alleging how the learning corrective action contract is wholly arbitrary and completely lacking in any legitimate justification. That the decision to issue this contract was subjective and may have been influenced by subjective personal feelings does not automatically equate with an action that is wholly arbitrary and

without justification. This is all the plaintiff can allege, which is not enough to state a claim under this theory. The court dismisses the plaintiff's equal protection claims and is not persuaded that an opportunity to amend would yield a plausible equal protection claim on the known facts.

*Breach of Contract*

The plaintiff lists "7.) Breach of contract" as one of his claims. ECF# 7, p. 1. At page 20, there appears the subheading, "3. Breach of Contract," with the allegation that during his grievance appeal process, "Regents of the appeals committee on the record refer to the signed student handbook as a contract." This subheading appears under the general heading of "Due Process," and the surrounding allegations point only to a due process claim. Read liberally, the plaintiff's contract claim could be construed as based on these later allegations:

> The Hutchinson Community College Handbook is the contract between Student and University. The rules for disciplinary dismissal are clear and defined then handbook. First there must be an investigation into the allegations, by the President Dr. Carter Files office and the student must be allowed to stay in classes until the investigation has concluded. Then only if the evidence clear cut breach of Student conduct rules, can either Tier 1 or Tier 2, punishments can be applied.

ECF# 7, p. 25. Also regarding the handbook, the plaintiff alleges earlier:

> Hutchinson Community College handbook is clear as well as the R.N. program guidelines that a student must pass all course work with a C average to stay in the program. Hutchinson Community College rules and regulations for academic dismissal are clearly defined in {exhibit 1 academic rules for dismissal} that a student must maintain a passing G.P.A. of greater than a 1.7 cumulative or be placed on academic probation for a semester. Only if the cumulative G.P.A. stays lower than a 2.0 over all during the probationary period may a student be

dismissed from the institution. Subsequently, in the grievance section of the Student handbook if any student has made a grievance or disciplinary issue the student will be able to stay in the course section until the investigation by the Vice Presidents and Presidents office have been concluded. {see exhibit 2 student handbook exhibit and proves retaliation point of law as he student that makes a grievance against an instructor must be allowed to remain in classes until the instructor has been investigated first, before any grounds or action can be taken against the student}.

ECF# 7, pp. 8-9. The defendants summarize these allegations and seek

dismissal, because the plaintiff's allegations fail to show that the handbook

constitutes a contract and, alternatively, that its terms were breached.

While the plaintiff refers to the student handbook, he does not

attach the full handbook or all relevant portions to his complaint. Nor does

he refer to or cite any specific provisions within it as evidencing or justifying

a contractual intent or expectation. In response to the defendants' motion,

the plaintiff does attach copies of HCC's policies on academic standing,

probation, dismissal and reinstatement, as well as disciplinary proceedings.

The plaintiff does not argue how these policies evidence a contractual intent

or expectation. The defendant HCC points out that what the plaintiff alleges

to be provisions from a handbook are not from any handbook, but instead

are no more than the general school policies found in HCC's 2014-15 Catalog

provided to the students. To their motion, the defendants attach this catalog

which the plaintiff quoted from in his complaint. ECF# 71-4. As noted by the

defendants, the following disclaimer appears at page seven of the catalog:

This catalog is for informational purposes only and does not constitute a contract. Every reasonable effort was made to ensure that all

information contained herein is accurate. Hutchinson Community College reserves the right, at any time, to change graduation requirements, costs, curricula and content, without notice. The college further reserves the right to add or delete course offerings and other information without notice. Information about changes is available from college counselors and advisors or on the college website.

ECF# 71-4, p. 7.

The court agrees with the defendant that plaintiff's allegations of an actual, enforceable contract existing are conclusory and unsupported by well-pleaded factual allegations. There is nothing specifically alleged or cited of record to make the likelihood of any such contract a plausible proposition. *See Borwick v. University of Denver*, 569 Fed. Appx. 602, 606 (10th Cir. Jun. 24, 2014). The quoted disclaimer plainly states that the catalog does not constitute a contract and that all information found in it was subject to the college's unilateral change. *See Doe v. Oklahoma City University*, 406 Fed. Appx. 248, 252 (10th Cir. Nov. 2, 2010) (affirmed dismissal based in part on district court's conclusion, "that her breach contract claim must also fail because OCU Law School's student handbook, upon which the claim was based, plainly stated that it did not form a contract between the students and the university."). The plaintiff's reliance on HCC's general policies found in various publications does not establish a contract. *See Gokool v. Oklahoma City University*, 716 Fed. Appx. 815, 818 (10th Cir. Dec. 8, 2017)(relying on Oklahoma law). "A contract implied in fact arises from facts and circumstances showing mutual intent to contract." *Mai v. Youtsey*, 231

39

Kan. 419, 422, 646 P.2d 475 (1982). The plaintiff has not alleged facts and circumstances showing any mutual intent to contract.

Even assuming there had been sufficient allegations of an implied contract based on the student handbook, the plaintiff's complaint fails to specify the facts showing a breach of the same. The plaintiff strains to read HCC's general policy statements as being the exact and exclusive contractual terms that fix HCC's discretionary authority over academics to the specific matters discussed. What the plaintiff alleges and cites as the terms of the handbook, catalog, or policies are not reasonably susceptible to such a strict reading, particularly one that would narrowly circumscribe HCC's authority to regulate academic matters. There are no alleged terms of any handbook, catalog, or policy to support the plaintiff's claim that HCC could not dismiss a student for academic reasons, unless the student's GPA falls below a certain level or until the grievance investigation and appeal process is completed. Instead, the student handbook provides, as the defendants quote, that "Students who believe they have been treated unfairly with regard to academic regulations such as academic dishonesty, academic probation and dismissal and reinstatement may request in writing a hearing before the Vice President of Academic Affairs." ECF# 71-3, p. 2. The plaintiff has not alleged any violation of this term. The plaintiff's academic dismissal was due to his clinical performance and his failure to sign the corrective action contract. The court finds nothing in the allegations or

exhibits that kept HCC from using learning corrective action contracts and from dismissing a student for not signing the contract as expressly warned therein. The court finds that the plaintiff has not alleged a breach of contract claim and gives the court no reason to believe that an amendment would cure these pleading deficiencies.

*Kansas Civil Rights Act*

Because there is no Kansas statutory act with this title, the defendants presume the *pro se* plaintiff liberally borrowed allegations from the Michigan federal district court opinion that discussed the Michigan Civil Rights Act, and the plaintiff merely substituted "Kansas" for "Michigan." The complaint does not cite any Kansas statutes as constituting the Kansas Civil Rights Act. If the plaintiff was intending to bring a discrimination claim under the Kansas Act Against Discrimination ("KAAD"), K.S.A. 44-1001 et seq., he has not alleged facts that support a claim of discrimination under anything that resembles a claim of KAAD discrimination. He refers to himself as possibly coming within certain protected groups, but he does not allege any facts tending to show discriminatory treatment because of his membership in a protected group. Throughout his allegations, the plaintiff asserts conclusory and blanket statements of "discrimination" without specifying that any such discrimination was because of or by reason of his protected status. The court dismisses this claim.

*Kansas Victim Protection Act*

The plaintiff again refers to some state statutory act by an unknown name without a legal citation. He mentions "Kansas Victims' rights law" in connection with his allegation that Hackler denied the plaintiff's right to bring family members or counsel to a "faculty facts and findings meeting." ECF# 7, pp. 7-8. The plaintiff's allegations utterly fail to state any claim under this title.

*Defendant HCC—Municipal Liability under § 1983*

Not only has the plaintiff failed to state a § 1983 constitutional violation, but he has not alleged the existence of an HCC municipal policy or custom giving rise to liability under 42 U.S.C. § 1983 pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 690-91 (1978). "[A] plaintiff must show 1) the existence of municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged." *Bryson v. City of Oklahoma* City, 627 F.3d 784, 788 (10th Cir. 2010) (citation omitted), *cert. denied*, 564 U.S. 1019 (2011); *see Hershey v. Kansas City Kansas Community College*, 2017 WL 661581 (D. Kan. Feb. 17, 2017); *Chonich v. Wayne County Community College*, 973 F.2d 1271, 1278-80 (6th Cir. 1992), *cert. denied*, 512 U.S. 1236 (1994). As the defendant HCC argues, the plaintiff, instead of alleging that HCC violated his constitutional rights by following a college policy or custom, seeks relief against HCC for not following its college policies. The plaintiff has failed to

allege a factual basis for municipal liability under *Monell* against HCC and against the individual defendants in their official capacity.

*Individual Defendants—Individual Capacity*

"The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Toevs v. Reid*, 685 F.3d 903, 909 (10th Cir. 2012) (internal quotation marks and citations omitted). A defendant's entitlement to qualified immunity is a legal question. *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007), *cert. denied*, 552 U.S. 1181 (2008). "Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 516 (10th Cir. 1998) (internal quotation marks and citation omitted). This includes administrators and instructors at a community college. *See, e.g., Crawford v. Columbus State Community College*, 196 F. Supp. 3d 766, 776 (S.D. Ohio 2016); *Deegan v. Moore*, 2017 WL 1194718, at *8-*9 (W.D. Va. Mar. 30, 2017); *Chandler v. Forsyth Technical Community College*, 2016 WL 4435227, at *6-*7 (M.D. N.C. Aug. 19, 2016).

As already quoted from *Robbins*, "To 'nudge their claims across the line from conceivable to plausible,' *Twombly*, 127 S.Ct. at 1974, in this context, plaintiffs must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and that those rights were clearly established at the time." 519 F.3d at 1249. Title 42 of the United States Code allows an injured person to seek damages for the violation of his or her federal rights against a person acting under color of state law. See 42 U.S.C. § 1983. To assert a claim under § 1983, the plaintiff must show (1) that he had a right secured by the Constitution and laws of the United States that was violated (2) by a person who acted under color of state law. *Hall v. Witteman*, 584 F.3d 859, 864 (10th Cir. 2009). From what the court has already concluded above, the plaintiff has failed the first prong of alleging facts sufficient to show a plausible violation of constitutional rights. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

If the plaintiff had alleged facts giving rise to a constitutional right violation against an individual defendant, then the plaintiff has the burden of also alleging facts sufficient to show that the constitutional right "was clearly established at the time of the conduct in question." *Dahn v. Amedei*, 867 F.3d 1178, 1185 (10th Cir. 2017). A right is clearly established when it is "sufficiently clear that every reasonable official would have

understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted). In short, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. The Tenth Circuit has stated that, "a plaintiff may satisfy this standard by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, the clearly established weight of authority from other courts must have found the law to be as plaintiff maintains." *Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015) (internal quotation marks and citations omitted).

The court agrees with the defendants that the plaintiff has not alleged sufficient facts to show the violation of a clearly established constitutional right. The court has already discussed the plaintiff's deficiencies in alleging any constitutional violation. Moreover, the plaintiff has not carried his burden of showing legal authority clearly establishing that a reasonable official would know his or her conduct was unlawful in issuing and enforcing a corrective action contract under the circumstances here, in dismissing the plaintiff from the nursing program for failure to sign the contract, and in addressing and reviewing the plaintiff's grievance and appeal as was done here. The individual defendants are entitled to dismissal on qualified immunity grounds.

*Tort Claims Against Individual Defendants*

The court's prior order addressed the plaintiff's failure to comply

with K.S.A. § 12-105b(d):

> This provision requires a person asserting a claim "against a
> municipality or against an employee of a municipality which could give
> rise to an action brought under the Kansas tort claims act" to file a
> written notice "with the clerk or governing body of the municipality"
> that contains all the required information. K.S.A. § 12-105b(d). A
> "municipality" includes the definition found at K.S.A. § 12-105a.
> *Rockers v. Kansas Turnpike Authority*, 268 Kan. 110, 115, 991 P.2d
> 889 (1999). This definition expressly includes a "community junior
> college." K.S.A. § 12-105a. Thus, K.S.A. § 12-105b(d) requires the
> plaintiff to give written notice to HCC, as a municipality, before
> bringing tort claims against it. This requirement is "jurisdictional like"
> such that, "[i]f the statutory requirements are not met, the court
> cannot obtain jurisdiction over the municipality." *Myers v. Bd. of Cty.
> Comm'rs of Jackson Cty.*, 280 Kan. 869, 877, 127 P.3d 319 (2006).
>    The written notice requirement of K.S.A. § 12-105b(d) "is a
> condition precedent to suit" and "under Fed. R. Civ. P. 9(c), a plaintiff
> must include a statement in his Complaint alleging that he has
> performed the required notice." *Wanjiku v. Johnson County*, 173 F.
> Supp. 3d 1217, 1236 (D. Kan. 2016) (noting that Fed. R. Civ. P. 9(c)
> provides that "it suffices to allege generally that all conditions
> precedent have occurred or been performed.") The court does not find
> in the plaintiff's form complaint or in his supplement an allegation that
> he provided HCC with statutorily required notice. The court also finds
> no mention of this written notice in the plaintiff's response to this
> motion to dismiss. It is certainly the plaintiff's burden to establish
> jurisdiction, and the plaintiff has not done so in his complaint or
> response. *Pro se* plaintiffs must still "allege the necessary underlying
> facts to support a claim under a particular legal theory." *Hammons v.
> Saffle*, 348 F.3d 1250, 1258 (10th Cir. 2003). Under these
> circumstances, the court may rightly infer that the plaintiff is
> conceding that he did not substantially comply with § 12-105b(d) and
> file the required notice. *Wanjiku*, 173 F. Supp. 3d at 1236. "Because
> the Court finds that plaintiff concedes he did not file the required
> notice here, allowing plaintiff to amend his Complaint 'would be futile
> as defendant would still be entitled to judgment on the pleadings
> for failure to comply with K.S.A. § 12–105b(d).'" *Wanjiku*, 173 F.
> Supp. 3d at 1237 (quoting *Debbrecht v. City of Haysville, Kan.*, 2012
> WL 1080527, at *6 (D. Kan. Feb. 7, 2012)). Finding it lacks
> jurisdiction over any state law tort claims against HCC or any of its
> employees, the court dismisses the same without prejudice and does

so without making any judgment as to the state law tort claims' merits or as to the plaintiff's ability to satisfy this notice requirement in a future suit. *Id*.

ECF# 28, pp. 8-10. The defendants do not address any of the plaintiff's state law tort claims in reliance on this court's prior ruling. ECF# 71, p. 1. The plaintiff does not take issue with the defendants' application of that ruling to all the individual defendants.

IT IS THEREFORE ORDERED that the defendants' second motion to dismiss (ECF# 70) is granted;

IT IS FURTHER ORDERED that the plaintiff's motions for ruling (ECF# 106 and 107) are granted insofar as this order is filed and are denied in all other respects.

Dated this 22nd day of June, 2018, Topeka, Kansas.


s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge